MITCHELL TRANSP. Co. *v.* PATTERSON and others.

*(Circuit Court, W. D. Tennessee. January 17, 1884.)*

1. MARINE INSURANCE—GENERAL AVERAGE—SEPARATION OF CARGO.
     Where the captain of a sunken steam-boat reshipped a part of his cargo on another vessel, consigned to agents of his own, with instructions not to deliver to the original consignees except upon their giving a general average bond, and, having returned to the port of shipment for that purpose, did not notify the consignors, *held*, that this was evidence of his intention not to separate that portion of the cargo from the burden of the general average, and that it was liable to contribution, notwithstanding the sunken vessel, when raised, returned to the nearest port of safety for repairs, and did not again take on board that part of her cargo, and did not complete the voyage.

2. SAME SUBJECT—EXPENSES.
     The general average should include all the expenses from the disaster, not excluding those incurred for the reshipment of another part of the cargo from the port of safety first reached.

This was a case in equity by which the owners of the steam-boat Robert Mitchell sought to recover from sundry defendants their shares of a general-average expense made in endeavoring to raise the said steamer and the cargo on board. The following are the facts of the case:

The steamer Robert Mitchell, while on a trip from Cairo to New Orleans, struck some hidden obstruction in the Mississippi river at a point near Fox island, and sank. This island is about 60 miles below Memphis, Tennessee. The boat and cargo were in imminent peril of total loss. She had on board an assorted cargo of grain, flour, meal, hay, horses, oil, and about 750 bales of cotton. The latter was

upon the guards and in the engine-room of the boat. There being, at the place of disaster, no adequate means of removing or protecting the cargo, or of obtaining any assistance by telegraph or letter, the captain left the Mitchell in charge of the mate, with instructions to keep the cotton and other cargo from floating off, and to save and protect it so far as could be done, went to Memphis, and ordered the wrecking boat, then lying below St. Louis, to go at once to the Mitchell. He also found the steam-boat Choteau at the landing, loading for New Orleans, and engaged her at an agreed freight or salvage to stop on her down trip at the place of disaster, and assist in taking off the cotton and other freight stowed upon the deck, as well for the purpose of lightening the Mitchell and preparing to raise her and the remaining cargo on board, as for sending the cargo so removed forward to its destination or to a place of better security. The captain of the Mitchell accompanied the Choteau to the place of the accident, but upon arrival found the condition of things to have become more serious; and the Choteau refused to receive and transport the cotton except at an advanced freight or salvage. An agreement as to price was reached, and the master and crew of the Mitchell assisted the crew of the Choteau to unload the greater portion of the cotton, with other freight which was on the deck and in the engine-room, and place it upon the Choteau.

There was no place at or near this point where the cargo thus removed to the Choteau could be protected and saved from further loss so well or cheaply as by sending it on to New Orleans, the port of destination. The captain of the Mitchell shipped it all in his own name to an agent selected by him in New Orleans, with instructions to deliver it to the consignees upon their signing an average bond. Upon its arrival in New Orleans the underwriters of the cotton obtained possession of it upon the payment of the Choteau's freight, without giving any average bond, they claiming that it was not a case for a general average. This cotton and other cargo received by the Choteau and forwarded to New Orleans did not require for its removal and protection the aid of the wrecking boat, but it was protected upon the Mitchell by her own officers and crew, who assisted the crew of the Choteau in removing it from the Mitchell and placing it upon the Choteau. The wrecking boat was in the mean time on its way to the Mitchell, but did not arrive there until after the Choteau left with the cotton in question. It did, however, arrive at the Mitchell and had commenced efforts to raise her and the remaining cargo several days before the Choteau arrived at New Orleans. The cotton in question was delivered to the agent appointed by the captain of the Mitchell, and before the same came to the underwriters of the cotton.

In the raising of the Mitchell difficulties not anticipated were encountered, and portions of the boat had to be cut away. The value of the boat and remaining cargo raised was but about one-third the value of the boat and cargo, including the cotton in question. The freight-

money of the cotton to New Orleans upon the Choteau was included in the average expense, but very much the largest part of the expense was that of the wrecking boat, and the efforts to raise the Mitchell and the cargo left upon her after the cotton had been placed upon the Choteau.

It is usual in such cases to employ a wrecking-boat, and the deck cargo is generally removed for the purpose of lightening the sunken vessel and of thereby aiding to raise it, and the cargo remaining upon it before the wrecking boat can effectually proceed with its work, though in this case the wrecking boat did not actually aid in removing this deck cotton. The efforts to relieve the Mitchell and her cargo, however, were continuous from the time of the disaster to the raising of the vessel with the cargo on board. Proof was offered to show that under the circumstances developed in this case it was the custom on the western rivers to embrace all the expenses claimed in the general average statement.

Under these circumstances it was claimed by the underwriters upon the cotton that the captain of the Mitchell had separated the cotton from the Mitchell and put it in a place of security without any intention of again placing it on her or of completing his trip, and that it could not, therefore, be required to contribute for any part of the expenses subsequently incurred in raising the Mitchell and her remaining cargo, as the cargo was not taken or intended to be taken on board the Mitchell, and as she did not complete her trip. The case of *Job* v. *Langton*, 6 El. & Bl. 790, and other English and American cases were relied upon to sustain that position.

On the other hand, it was contended that the shipment of the cotton by the captain of the Mitchell in his name to an agent appointed by him, with instructions not to deliver it without an average bond, showed that he did not intend to separate it from the general expense; that the owners of the cotton and their underwriters were interested in the saving of the Mitchell and her remaining cargo, in order that the cotton might be under the protection of the general average until its arrival and safe delivery in New Orleans to the consignees; and that, being so interested in saving all that could be saved as a contributing interest, the case was, under the American law, one of general average, and that all the property in peril at the time of the disaster, and when the efforts to protect and save it were commenced, must be taken into the average as a contributory interest.

*Lincoln & Stevens* and *H. C. Warinner*, for complainant.

*Clapp & Beard*, for defendants.

Before BAXTER and HAMMOND, JJ.

BY THE COURT, (*orally.*) The captain of the Mitchell did not, evidently, intend to separate the cotton of the defendants from the rest of the cargo, nor to deliver it to them at their own risk after the disaster. Not only did he ship it to his own account, and direct that it should not be delivered to the original consignees without an average

bond, but, on his coming to Memphis, he did not notify the consignors, nor rely on them to save their shipments. The case is one for general average; and the fact that the Mitchell did not complete her trip, but returned, when raised, to the nearest port of safety for repairs, should not defeat the contribution under the facts of this case. The custom to include certain expenses in the general average is, perhaps, not admissible as evidence; but in this case there was, in effect, one continuous effort to save the sunken vessel and her cargo, and the average should include all the expenses from the sinking of the vessel, not excluding those incurred for a reshipment of a part of the damaged cargo from Memphis to New Orleans on the Cherokee. Decree accordingly.